**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-20321-CR-RAR**

**UNITED STATES OF AMERICA**

**v.**

**MALAINA CHAPMAN,**

      **Defendant.**

_____/

## GOVERNMENT'S OBJECTIONS TO THE PSR, RESPONSE TO OBJECTIONS TO THE PSR AND SENTENCING MEMO

## SUMMARY OF ARGUMENT

The first section of this filing deals with the government's objections to the PSR on this issue of loss. In the second section the government is urging this Court to sentence the defendant within the advisory guideline range for the following reasons: 1) The need to promote general deterrence against crimes of this nature; 2) the shocking breadth of the defendant's schemes to defraud the United States, the State of Florida, the City of Miami when the country was suffering the effects of the Covid-19 pandemic, 3) the defendant faced no economic hardship when she chose to engage in this crime and was motivated by nothing more than sheer greed when she chose to victimize several trust-based government relief programs.

## FACTS

The defendant was employed by the Small Business Administration (SBA) from September 28, 2020, through March 18, 2021. She earned a salary of $56,917 and also received VA benefits. Before, during and after her employment with the SBA she undertook a multipronged assault on the Federal, State and Local Covid-19 relief efforts trying to wring every dollar she could out of the United States Government. The defendant wasted no time in exploiting the Covid-19 Pandemic when she submitted the first of several false and fraudulent Economic

Injury Disaster Loan (EIDL) applications on April 14, 2020. The SBA accepted the representations

in this application and gave her a loan in the amount of $48,200.  Apparently, that was not enough

for the defendant, and she filed two other EIDL applications which meant her fraud on the EIDL

program totaled $118,800.

On February 10, 2021, while still employed by the SBA, the defendant began her assault

on a second Covid-19 relief program when she submitted a false and fraudulent loan application

that induced a PPP lender to give her a loan in the amount of $17,052 (DE 42:25).   Nine (9) days

later the defendant submitted another false and fraudulent loan application and obtained a loan in

the approximate amount of $35,477. The defendant submitted additional applications that resulted

in a loss to the government of $123,946.

The third and fourth programs the defendant victimized were the City of Miami and State

of Florida Emergency Rental Assistance Programs (ERAP). These programs were designed to help

residents avoid being evicted from their properties while the economy was still suffering the effects

of the pandemic. Despite inheriting a half interest in properties worth over $727,299 in or around

December of 2021, on April 13, 2002, the defendant claimed that she had no assets in excess of

$5000 when she submitted her application.   The City of Miami accepted her representations and

gave her $14,525 to pay her rent.  Finally, the defendant submitted false claims to the State of

Florida's ERAP when she falsified her mother's signature that claimed the defendant was being

evicted from a property she actually owned at the time of the application. The State accepted these

recommendations and gave the defendant a grant of $15,000.   (DE 42: ¶ 33-34).

The defendant was not satisfied with merely submitting her own fraudulent applications

for Covid-19 relief benefits.  Like any good entrepreneur the defendant decided to scale up her

business and she began preparing loan applications for others in return for a ten percent kickback.

Investigation has revealed that the defendant prepared numerous loan applications for more than

five people and the PPP program suffered losses of $223,981 as a result of her being the ringleader of her own fraud ring.[1]   Included in this group of applicants was the father of her children who was incarcerated when his application was submitted.  The defendant moved the entire $20,833 from a joint account to her own account shortly after the loan proceeds hit the account.

In addition to leading her own fraud ring, the defendant assisted a friend of hers, Raisha Kelly in her PPP loan fraud scheme.  The defendant showed Kelly how to commit PPP fraud, answered any questions that arose and most importantly provided fake Schedule C's that were submitted in support of the loan applications that Kelly filed. (DE 42: ¶ 31) The defendant taught Kelly how to commit PPP fraud and gave her documents needed to complete the scheme. In one text string, Kelly asked the defendant for help in completing a PPP application and the defendant provided her with the gross income needed so that Kelly would get a $45,000 loan. In another portion of the text string Kelly said "I need you to walk me through 1" and defendant provided her with documents. In another text string Kelly asked the defendant to "send a text (Sic) return so I know what numbers to plug in" and the defendant replied "sent." In another text string the defendant and Kelly discussed making fake bank statements. In a final text the defendant and Kelly discuss the need for setting up false email accounts for the loan applicants they are working with, a crucial part of Kelly' scheme which made it harder to detect. (DE 42: ¶ 30).

In addition to providing advice on how to commit the fraud, the defendant became actively involved when she created the false Schedule C's that were attached to a number of applications prepared by Kelly. Through the execution of an email search warrant on Kelly's email account (Info.wealthyholdings@gmail.com) there were thirteen (13) instances in which the defendant sent Kelly false IRS Form 1040, Schedule C's in the names of applicants for whom Kelly later

---

[1] This figure is derived by adding $198,981, the amount of the loan plus $2500 loan processing fee paid to the lenders.

submitted a PPP loan application In total, the government believes that Kelly's fraud scheme was responsible for $937,716 in losses to the government.

## ARGUMENT

## THE CORRECT MEASURE OF LOSS IS BETWEEN $1.5 MILLION AND $3.5 MILLION

The government believes that this Court should find under a relevant conduct analysis this Court should find that the total loss attributable to the defendant is $1,574,768.[2]

The government and the defendant agree on the following losses; 1) $15,000 related to her submission of false and fraudulent applications to the State of Florida Emergency Rental Assistance Program (ERAP); 2) $14,525 related to the submission of false applications with the City of Miami ERAP; 3) $140,000 associated the submission of two (2) false and fraudulent loan applications to Credit Union 1; and 4) $118,800 for the EIDL loans because the government concedes that interest on these loans should not be included in the loss figure. This amount totals $289,125.

The parties do not agree on the following issues related to the loss calculation; 1) the inclusion in the PPP loss figures of the $2500 fee paid to the banks for processing the loans, 2) the inclusion of losses related to the scheme of Raisha Kelly that the defendant aided and abetted.

The government believes that the proper measure of loss for the PPP loans the defendant took out in her own name is $123,946 and contrary to the defendant's belief, that figure does not include interest. This figure was calculated by adding the defendant's five (5) PPP loans which total $111,446 and a $2500 processing fee for each loan.   The government believes that the proper measure for the loans the defendant procured on behalf of applicants in return for the payment of

---

[2] This figure does not include interest but does include PPP processing fees which will be explained in more detail below.

a kickback is $223,981. This figure was calculated by adding up the ten (10) PPP loan the defendant procured for others and a $2500 processing fee for each loan.

The government has not been able to find any case law directly on point that deals with a PPP loan fee paid to the banks. The government has found only one case involving an administration fee that is analogous to the fee paid in connection with PPP loans. In United States v Torlai 728 F. 3d 932 (9th Cir. 2013) the District Court was faced with the calculation of loss in a federal crop insurance fraud scheme and the Court included "A&O fees" which were described as "fees the government pays to the insurance company for selling and servicing the policy." (Id. at 936) The 9th Circuit upheld inclusion of these fees and reasoned that they were reasonably foreseeable to the borrower who was a knowledgeable businessperson.  This case is on all fours with the instant case because the "A&O fees" are exactly the type of fee arrangement the government created in enacting the PPP loan fraud program.   Like the defendant in Torlai, these losses were reasonably foreseeable to the defendant because she worked at the SBA during the pandemic and certainly had more knowledge of the program than the average borrower.

The parties larger dispute is the amount of loss attributable to the defendant's involvement in the PPP loan fraud scheme of Raisha Kelly. The government believes that the defendant should be held responsible for $937,716 in losses and the defendant believes that the defendant should not be held responsible for the losses incurred by Kelly's scheme.  At Kelly's trial, the government limited the presentation of its proof to thirteen (13) separate applicants, who submitted twenty-two (22) loan applications that were linked to Kelly. The total amount of fraud associated with those twenty-two (22) applications was $443,895.[3]  In addition to the loans themselves, the government

---

[3] The government has provided the defense with a spreadsheet that was introduced at trial that documents these losses. At the sentencing hearing for Kelly, the Court did not permit the government to call its case agent and introduce any evidence of further losses associated with Kelly. For the purposes of this hearing that document will be Exhibit 1

the $2500 processing fee adds another $55,000 to the loss total.  Kelly was linked to these twenty-two (22) loans by several facts: 1) the IP address associated with the submission of the applications was one that Kelly used on prior occasions; 2) the applicant made a kickback payment to the Kelly, 3) Kelly received Schedule Cs from the defendant; and 4) the email addresses for the applicant used the same naming convention, always containing the applicant's first name, a period, the applicant's last name and a prefix or suffix of 00.  In sum, the losses that the government proved at trial total $498,895 which includes the $2500 fee paid to the lender.

At the sentencing hearing, the government will introduce evidence that there is an additional loss of $483,821 associated with Kelly's fraud scheme.  In calculating this loss, the government has identified an additional thirteen (13) additional PPP loan applicants not specifically named in the Indictment that were linked to Kelly by at least one of the same four (4) criteria mentioned above.[4]  The sum of the loans given to these individuals was an additional $393,821 (Exhibit 2).[5]  There was a total of eighteen (18) loans and including the $2500 fee paid to the bank, the government suffered a total loss of $483,821.

The government believes that the defendant must be held accountable for the entire loss associated with the defendant's scheme for two (2) reasons. First, as noted above, the defendant provided invaluable advice about how to commit PPP loan fraud. She instructed Kelly on the amounts to place on the applications, how to alter bank statements, and the necessity of setting up fake email accounts for each of the applicants she brought into the scheme. This advice was crucial in hiding Kelly's involvement in the scheme as the use of the fake email addresses made it harder for the government to uncover Kelly's involvement.  Given the fact that the defendant provided

---

[4] The Government introduce Exhibit 2 at the hearing to prove these facts.
[5] The government will introduce Exhibit 3 to prove this fact.

this integral advice at the beginning of the scheme, it stands to reason that it was reasonably foreseeable that Kelly would use her advice to commit fraud.

The second reason that the defendant should be held accountable for the entire fraud loss is because in addition to the provision of advice, the defendant became an active participant in this fraud when she provided Kelly with thirteen (13) separate false tax documents that were ultimately associated with submission of false and fraudulent loan applications.  The government believes that the defendant's words of advice and encouragement coupled with her actions demonstrate why she should be held liable for the entire loss associated with the scheme that she aided and abetted.

**THE COURT MUST FASHION A SENTENCE THAT PROPERLY PUNIHES THE DEFENDANT AND DETERS OTHERS FROM VICTIMIZING TRUST BASED GOVERNMENT PROGRAMS**

The government believes that only a sentence within the guideline promotes general deterrence and properly punishes the defendant for her actions. The 11th Circuit has stated that because economic and fraud-based crimes are "more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v Martin 455 F. 3d 1227, 1240 (11th Cir. 2006): (citing Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L.Rev. 721, 724 (2005)). Indeed, the legislative history of Section 3553 shows Congress recognized "the critical deterrent value of imprisoning serious white-collar criminals, even where those criminals might themselves be unlikely to commit another offense[.]" Martin, 455 F.3d at 1240 (citing S. Rep. No. 98-225, at 76, 91-92 (1983)).  The Eleventh Circuit also observed that "[d]defendant's in white collar crimes **often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment**." Martin, 455 F.3d at 1240 (emphasis added).

The facts of this case are in some ways the prototypical white-collar case that has plagued this community for decades—a person deciding to victimize a trust-based government program. In other ways the facts of this case are an outlier because most people who, like this defendant, make a conscious premeditated decision to victimize a trust-based government program usually chose one program to victimize not several as this defendant did.    As this Court knows all too well, if ever there was a jurisdiction that needs to send a strong message against fraud it is this District. Miami is a hotbed of all types of fraud that run the gamut from health care and PPP fraud to complex investment fraud schemes.  In a community plagued by such conduct, the sentence in this case must send a serious message so that would-be white-collar criminals think twice before embarking on their fraud schemes. The sad truth is despite the best efforts of law enforcement a tiny percentage of those who commit these types of crimes are ever held accountable for their actions. Potential fraudsters at all levels need to be forced into a cost benefit analysis that weighs the prospect of a lengthy prison sentence against the relative ease of committing the crime and the low chance of detection faced by the average white-collar criminal.

Some have argued that this type of fraud should be seen as a onetime event because it took place during a pandemic, a once in hundred years event. That said, it is certainly possible that a natural disaster such as hurricane might hit this community and if it does you can be sure a trust-based government relief program will follow.  Once again people in this community will have choice and ask themselves a question. Should I steal some easy money from this program because they hardly ever catch anyone for stealing from it?  Only a lengthy prison sentence within the guideline range sends the right message, namely, that you will serve a significant prison sentence if you steal from a trust-based government relief program

A sentence within the guideline range is also appropriate because the defendant's crime was not borne out of financial need.  A review of the facts shows that the defendant was motivated

8

by nothing more than greed and a desire to acquire luxury goods that she felt she was entitled to have. At the time she decided to begin her multi-pronged assault on the Federal, State and local governments Covid relief efforts she was earning $56,917 from her work as a disaster relief specialist with the SBA.  In addition to her salary, the defendant received approximately $1800 per month payments from the United States Veterans Administration.  In total the defendant received $78,517 from the same government she chose to victimize.

Apparently, receiving $78,517 per year was not enough money for the defendant, so she chose to victimize her employer and U.S. taxpayers by submitting multiple fraudulent PPP and EIDL applications in the names of companies she controlled—some of which were mere shells and engaged in no legitimate business activities. She also applied for a PPP loan in the name of her incarcerated domestic partner and pocketed the entire $20,833. These efforts netted the defendant over $240,000.  Apparently getting over a quarter of a million dollars was not enough to satiate this defendant's desire for money for money because her conduct continued.

On December 31, 2021, the defendant received a substantial windfall when she inherited 50% of three (3) separate properties that, according to the Miami Dade County Property Appraisers Website, had a combined value of $727,299.  Sadly, receiving the windfall of approximately $360,000 in property was not enough to satisfy the defendant's desire for money. While still receiving $1897 in VA benefits, she chose to steal from the State of Florida and City of Miami. On April 25, 2022, she submitted a false and fraudulent loan application to the city of Miami in which she lied about the fact she owned three (3) properties in Miami-Dade County and that between September 2021 and April 2022, the defendant had received $24,115 from the rental of the apartment she was purportedly in danger of being evicted from.  The City of Miami trusted the representations in her application and promptly gave her $14,525.  During that same time period the defendant also stole from the State of Florida by pretending that she was a tenant living at 2614

NW 55th Terrace, one of the properties she inherited from her mother. She simulated her eviction by signing the name of her dead mother.  The State accepted these representations as true and gave her $15,000.

The defendant spent her fraud proceeds on all of the luxury items which she felt she was entitled to.  She spent $2700 at Louis Vuitton, $2600 at Nordstrom, and $4938 at Goyard. She spent $1016 at Chanel. The defendant also spent $4000 at Tea Cups, Puppies & Boutique, which describes itself on its website as a place offering "tea cup puppies for sale along with all the designer dog clothing and pet accessories you could imagine!"  The defendant also was making lease payments of $2336 to BMW of Pembroke Pines.[6] In 2022, after all of this luxury spending the defendant submitted a fraudulent application for SNAP benefits from the State of Florida when she lied about the amount of her VA benefits.

In sum, the defendant never met a trust-based government program that she didn't steal from.  Only a lengthy prison sentence within the guideline range will protect society from a financial predator who views government relief programs as her personal piggy bank that existed to fund her dreams of living in the luxury she felt entitled to.  Even more importantly, a prison sentence within the guideline will tell others that actions have consequences, and they should think twice before victimizing trust-based programs to satisfy their need for luxury goods and services.

**{this space left intentionally blank}**

---

[6] The government will introduce Exhibit 4 to prove these facts.

## **CONCLUSION**

For the reasons stated above the government is asking this Court to sentence the defendant

to a term of imprisonment within the advisory guideline range.

 

 

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:    /s/ Daniel Bernstein
        Daniel Bernstein
        Assistant United States Attorney
        Fl BAR. No. No. 0017973
        99 N.E. 4th Street
        Miami, Florida 33132
        (305) 961-9169
        Email: Daniel. Bernstein@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 10, 2025, I electronically filed the foregoing with the

Clerk of the Court using CM/ECF.


               /s/ Daniel Bernstein
               Daniel Bernstein
               Assistant United States Attorney